**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 1:19-CV-24755-AHS

PHILLIP WILLIAMS, WILLIAM JONES,
MICHAEL ROBERTS, ALI BEY,
CHRISTOPHER MCGEE, TIFFANY
CUTHRELL, and MARIE VENTER,
individually and on behalf of a class and
subclasses of similarly situated individuals,

        Plaintiffs,

    v.

BURGER KING CORPORATION, a
Florida corporation,

        Defendant.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
<u>AND DENY CLASS CERTIFICATION</u>**

April 16, 2020

David P. Healy
Fla. Bar ID # 940410
dhealy@davidhealylaw.com
Dudley, Sellers, Healy, & Heath, PLLC
3522 Thomasville Rd., Suite 301
Tallahassee, Florida 32309
Tel: (850) 222-5400
Fax: (850) 222-7339

Eugene Y. Turin (*pro hac vice*)
eturin@mcgpc.com
McGuire Law, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Counsel for Plaintiffs and the putative Class*

## I.    <u>**INTRODUCTION**</u>

Defendant Burger King Corporation's "advertising tagline for the Impossible Whopper []
'100% Whopper®, 0% beef'" was meant to leave Plaintiffs asking, "where's the Beef?"
Unfortunately for Plaintiffs and thousands of other consumers across the country that relied on
Burger King's statements and advertising, the answer was in the very burgers they ate. Like so
many other corporations that try to cook up a hot marketing promotion—Burger King never
intended to *actually* deliver on its promises of a "0% beef" burger and prepared its "0% beef"
Impossible Whoppers on the same grill as all of its other meat products. It is little surprise then
that Burger King advertised that they would have "100% Whopper®" taste, since they were
actually cooked with 100% Whopper beef burgers. And while Burger King gladly took
Plaintiffs' money for its Impossible Whoppers, now that they are trying to hold its feet to the fire
about the very claims it made, Burger King is all to happy to feed them to the wolves and avoid
any responsibility for its own statements and advertising.

While Burger King cites to random news articles and television segments that it claims a
"reasonable" consumer would have somehow seen, it is Burger King's argument that consumers
should not have relied on the advertisements it explicitly placed in its stores that is unreasonable.
Burger King also makes the untenable argument that flyers that it instructed to be put in
customer's bag <u>*after*</u> they had already made their purchases somehow notified them about how
the Impossible Whopper was cooked. Grasping at straws, Burger King makes the even more
egregious argument that it is *Plaintiffs'* fault that they did not ask its cashiers to prepare the
burgers consistent with its own advertisement. If Defendant's arguments were allowed to carry
the day corporations would be free to make any advertisements or claims they wanted with
consumers bearing the sole responsibility for verifying their truth and accuracy. Fortunately, the

law recognizes that Burger King should be held accountable for its advertisements and promises to Plaintiffs and thousands of other customers that they would receive a completely meat-free Impossible Whopper. And while Defendant's arguments raise a lot of smoke, they ultimately go up in flames when held against the plain logic of Plaintiff's allegations that they purchased Defendant's Impossible Whopper, and paid a premium for it, because they believed they were purchasing a burger that from its ingredients, to the way it was cooked, contained "0% beef." It is that very same logic that also compels denial of Defendant's premature argument that there is no possible way that the Court could certify any proposed class under Rule 23.

## II.      STATEMENT OF FACTS

Burger King's Motion to Dismiss overwhelmingly relies on extraneous evidence wholly outside of Plaintiffs' First Amended Complaint to make it seem like it was blatantly obvious that its Impossible Whopper burgers were never prepared separately to ensure they actually remained meat-free as advertised. However, Plaintiffs' *actual* allegations – which are controlling here – regarding not just Burger King's plain advertising, but the context of its promotion of its Impossible Whopper burger, make it clear that Burger King absolutely intended to advertise a meat-free burger, and for consumers such as Plaintiffs and the other members of the Class to rely on such advertisements.

Specifically, as Plaintiffs allege in their First Amended Complaint (Dkt. 24) ("Complaint"), Burger King operates a number of fast food restaurants across the country and is best know for its "Whopper" burgers made with beef. (Complaint at ¶ 24.) However, knowing that there is a growing consumer demand for vegan, vegetarian, and meat-free food options, in April 2019 Burger King decided to tap into this demand by creating its "Impossible Whopper," with a burger patty made from "Impossible" meats. (*Id.* at ¶¶ 5, 25.) Critically, "Impossible"

2

meat is a trademarked product that is created by an entirely separate company and is "widely known . . . as a meat substitute" and "is one of the most popular meat alternatives in the country." (Complaint at ¶ 2.) Impossible "meats" contain absolutely no animal products or by-products. (*Id.* at ¶ 4.) Knowing that Impossible meats are widely advertised and known as a completely meat-free alternative, Burger King advertised its Impossible Whoppers with the tagline "100% Whopper 0% beef." (*Id.* at ¶¶ 5, 26; Motion to Dismiss, Dkt. 25, at 3.) Indeed, as Burger King itself disclosed, its drive-through and in-store advertising featured an image of the Impossible Whopper with the prominent text, "100% Whopper 0% beef". (Dkt. 19 at Exhibit 1.) However, despite knowing that Impossible meats are specifically advertised and known as being a completely meat-free product, and its advertisements that its Impossible Whopper – and not just the patty – is "0% beef," Burger King in fact cooked its Impossible Whopper patties on the same grill as its traditional meat products, including beef patties and chicken. (Complaint at ¶ 27.) As a result, the otherwise meat-free Impossible patties are contaminated with meat by-products and the Impossible Whopper burgers that Defendant sells are therefore not actually "0% beef" when the consumer eats them. (*Id.*) Critically, and contrary to Burger King's attempts to argue otherwise, Defendant did not actually have *any* disclosures that Plaintiffs saw, or could have even seen, prior to purchasing their Impossible Whoppers that they would be cooked on the same grill as Burger King's other meat products or that they would not in fact be entirely meat free. (*Id.* at ¶¶ 28, 36, 45, 51, 56, 60, 66, 72.)[1]

---

[1] While Burger King states that Plaintiffs "falsely" contend that there were no disclosures regarding how its Impossible Whoppers were prepared, the only piece of evidence that it cites to was the "bag flyers that were placed in customers' bags *after* they had already made their purchase. (MTD at 5; Dkt. 19 at ¶ 13).

The fact that Burger King relied on the "Impossible" meats brand name, and explicitly stated that its Impossible Whoppers were "0% beef" when they in fact were contaminated by meat by-products, was deceptive and misleading to Plaintiffs and thousands of other consumers across the country who purchased its Impossible Whoppers. (Complaint at ¶¶ 32, 33, 40, 46, 52, 57, 62, 68, 74.) For example, Plaintiff Phillip Williams saw advertising regarding Defendant's Impossible Whopper and decided to visit a Burger King located in Atlanta to try it. (*Id.* at ¶ 34.) Mr. Williams went through the drive-through and only saw Defendant's representation that the Impossible Whopper was made with an "Impossible" meat-free burger patty and, importantly, did not see anything that would suggest that his Impossible Whopper would be prepared on the same grill as Defendant's other meat products. (*Id.* at ¶ 36.) Relying on Burger King's advertising, Mr. Williams reasonably believed that the Impossible Whopper was in fact *completely* meat-free—and not just mostly so as Burger King would have it. (*Id.* at ¶¶ 37, 40.) Moreover, he specifically purchased and paid a premium for it based on Burger King's representations that it was "0% beef." (*Id.* at ¶ 40.) However, Mr. William's Impossible Whopper was not actually meat-free because it was covered in meat by-products from being prepared on the same grill as Burger King's other meat products. (*Id.* at ¶ 38.) Had he known that his Impossible Whopper was prepared in a way that it contained meat, and the Impossible meat patty no longer maintained its main quality as a meat-free alternative, he would not have purchased it. (*Id.* at ¶ 40.)

Plaintiff Marie Venter had the same experience when she also visited one of Burger King's drive-throughs in Georgia. (*Id.* at ¶ 70.) Ms. Venter wanted to try one of Burger King's Impossible Whoppers because she had seen Defendant's advertising and was hopeful that she would finally have a meat-free burger option from Defendant. (*Id.* at ¶¶ 71, 73.) Ms. Venter, like

4

Mr. Williams, never saw anything that suggested that Burger King's Impossible Whoppers were contaminated with meat from being cooked on the same surface as meat products, and she would have never purchased Burger King's Impossible Whopper if she knew that it was not prepared in a manner that the burger she received was actually meat-free. (Complaint at ¶¶ 72, 74.)

Similarly, Plaintiff William Jones saw Burger King's advertising for its Impossible Whopper and purchased several of its Impossible Whopper burgers and paid a premium for them specifically because he believed that they were completely free of any animal products. (*Id.* at ¶¶ 42, 43.) However, Mr. Jones did not in fact receive an Impossible Whopper that was free of any animal products because it was not cooked on a separate cooking surface. (*Id.* at ¶ 44.) Like Mr. Williams, Mr. Jones never saw any signage at the store indicating that Burger King did not cook its Impossible Whoppers in a way that the burger he received was actually meat-free, or that he could request to have it grilled separately. (*Id.* at ¶ 45.) He also would have never purchased Burger King's Impossible Whopper if he knew that it was not meat-free. (*Id.* at ¶ 46.)

Plaintiffs Michael Roberts and Ali Bey also shared the same experience when they purchased Burger King's Impossible Whoppers and paid a premium for them based on its advertising that they were "0% beef" and contained an "Impossible" meat patty that was free of any animal by-products. (*Id.* at ¶¶ 49, 55.) However, as Burger King's standard practice was to prepare their Impossible Whoppers on the same grill as their other meat products, Mr. Roberts and Mr. Bey instead received a burger that in fact contained animal products and did not have a meat-free Impossible meat patty. (*Id.* at ¶¶ 50, 56.) Neither Mr. Roberts nor Mr. Bey saw anything that could make them aware that the Impossible Whopper burgers they purchased were not meat-free and were not prepared consistent with Burger King's advertising. (*Id.* at ¶¶ 51, 56.)

5

Highlighting the consequences of Burger King's failure to actually provide its customers a "0% beef" Impossible Whopper or at least disclose that it would contain meat unless a special request was made to cook it separately, and further supporting Plaintiffs' allegations that Burger King's cooking method added meat products to its Impossible Whoppers, was Plaintiffs Christopher McGee's and Tiffany Cuthrell's experiences. Both Mr. McGee and Ms. Cuthrell, as the other Plaintiffs, purchased Burger King's Impossible Whopper specifically because they were advertised as "0% beef" and containing a meat-free Impossible meat patty. (Complaint at ¶¶ 59, 60, 64.) However, Mr. McGee and Ms. Cuthrell soon came to find out that Burger King's Impossible Whoppers were not meat-free when they experienced significant digestive distress shortly after eating them as they both maintained a meat-free diet. (*Id.* at ¶¶ 59, 61, 63, 65.) Neither Mr. McGee or Ms. Cuthrell, who were both acutely aware of their dietary restrictions, had any reason to believe that Burger King would cook its Impossible Whoppers in any way that would introduce animal products and thereby completely defeat the point of purchasing a product with a meat-free Impossible meat patty. (*Id.* at ¶¶ 60, 64–66.)

While Burger King attempts to throw water on Plaintiffs' allegations and dismiss them as "unreasonable" outliers, the fact that seven Plaintiffs across the country have come together to allege the same uniform experience that Burger King deceptively advertised and sold them an Impossible Whopper that was not actually "0% beef" is proof of the old adage that where there is smoke there is fire.

## III.   ARGUMENT

### A.   Standard of Law

When considering a motion to dismiss under Rule 12(b)(6) the Court must accept the allegations in the Complaint as true and construe them in a light most favorable to the plaintiff.

*ICON Health & Fitness, Inc. v. IFITNESS, Inc.*, No. 12-cv-20125, 2012 WL 1120925, at \*2 (S.D. Fla. Apr. 3, 2012).  "A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief."  *Id.* at \*2.  The pleading standard under Rule 8 does not require "detailed factual allegations" and a complaint need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Plaintiffs And Burger King Entered Into A Contract When They Accepted Burger King's Offer to Purchase a "0% beef" Impossible Whopper.

Burger King's argument that Plaintiffs cannot state a claim for breach of contract ignores basic principles of contract formation and that Plaintiffs' transaction with Defendant was the most simple and basic of all contracts—Burger King offered a "0% beef" Impossible Whopper for purchase, and Plaintiffs paid Burger King consideration in exchange. The resulting agreement was a legal and enforceable contract. Burger King's belated efforts to water down and shy away from its definite and explicit offer of a "0% beef" burger are not reasonable and should be rejected as a matter of law.

Burger King is correct that Plaintiffs are attempting to apply Florida contract law to their claims, and otherwise agree for purposes of this argument that the law on contract formation of the different states in which Plaintiffs made their purchases is similar. (MTD at 8.) As Burger King does not dispute, "[i]n Florida, a plaintiff must plead the existence of a contract by showing (1) an offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Schultz v. Am. Airlines, Inc.*, No. 18-cv-80633, 2019 WL 3000448, at \*2 (S.D. Fla. July 10, 2019). Critically, and getting to the meat of Burger King's argument, "whether an offer has been made depends on the objective reasonableness of the alleged offeree's belief that the

advertisement or solicitation was intended as an offer." *Schultz*, 2019 WL 3000448,  at *3 (citing *Mesaros v. United States*, 845 F.2d 1576, 1580 (Fed. Cir. 1988)). In short, Burger King argues that it offered nothing more than a "Whopper made with a plant-based (0% beef) patty" and that Plaintiffs' understanding that it promised a burger that was entirely meat-free was unreasonable as a matter of law. (MTD at 9.) Burger King's argument, however, is contrary to both its own admissions, and Plaintiffs' plain allegations.

Burger King admits that the advertising tagline for its Impossible Whopper was "100% Whopper 0% beef," and its in-store and drive-through advertising similarly stated clearly that the "Impossible Whopper" was "100% Whopper 0% beef." (Complaint at ¶¶ 5, 26; MTD at 3; Dkt. 19 at Exhibit 1.) Nowhere did Burger King limit, qualify, or otherwise explain that its "0% beef" promise was limited *just* to the patty inside the Impossible Whopper and *before* it was cooked. To the contrary, the advertisements shown to Plaintiffs and the other members of the Class depicted a whole, cooked, ready-to-eat Impossible Whopper with the prominent statement "100% Whopper 0% beef." Further ignored by Burger King are Plaintiffs' allegations that Impossible meat is widely known and has been advertised long before introduction of the Impossible Whopper as a meat-free alternative. (Complaint at ¶ 2.) As such, it is unreasonable, and in fact defeats the very purpose of ordering a burger with a meat-free Impossible meat patty, to expect it to be prepared in a manner that does not leave it meat-free—that is the very purpose of Impossible meat and why consumers pay a premium for it. Burger King acknowledges as much in its claimed "bag flyers" where it specifically explains how the Impossible Whopper is cooked and offers customers – albeit belatedly after their purchase – to have their burger cooked separately. (Dkt. 19 at Exhibit 2.) If consumers only cared whether there was an Impossible meat

patty inside their Impossible Whopper, Burger King would have no reason to address the issue of meat contamination from its standard cooking process.

Burger King's reliance on *Baltazar v. Apple, Inc.*, No. 1-cv-3231, 2011 WL 6747884 (N.D. Cal. Dec. 22, 2011) only furthers Plaintiffs' breach of contract claims. The claims at issue in *Baltazar* were based on nothing more than several "brief scenes [in commercials] depicting the iPad in use in 'outdoor locations'". 2011 WL 6747884, at *3. These advertisements did not feature any explicit statements about how the product would perform outdoors, did not feature any text about the product's features, and, in fact, one of the advertisements – unlike Burger King's unambiguous disclosures – specifically stated that the depicted use was "not necessarily what is practical" and, thereby, limited any contrary assumptions that the consumer could have had. *Id.* at *3. Here, unlike Apple, Burger King *did* make a "certain and definite" contractual offer when it explicitly stated that the Impossible Whopper the Plaintiffs paid for and would receive were "0% beef." (MTD at 8). Nor did Burger King include any limiting language whatsoever that would make Plaintiffs question whether they were in fact receiving an Impossible Whopper that was prepared so it was meat free and would prompt them to "ask[] cashiers about [its] cooking method[.]" (MTD at 10.)

The facts before the Court are instead far more akin to those in *Kearney v. Equilon Enterprises, LLC*, 65 F. Supp. 3d 1033 (D. Or. 2014). In *Kearny*, the defendant featured a simple advertisement stating, "buy 10 gallons of fuel, get a voucher for a free lift ticket." 65 F. Supp. 3d at 1035. However, when the plaintiffs purchased 10 gallons of fuel the defendant only provided them a "two for one voucher" that required a purchase of a second lift ticket in order to receive the "free" lift ticket. *Id.* at 1036. The defendant in *Kearny* asserted, much as Defendant does here, that its offer "lack[ed] specificity, and since '[a] contract requires a clear and unequivocal

acceptance of a certain and definite offer' the advertisement cannot constitute an offer." *Kearny*, 65 F. Supp. 3d at 1037 (internal citations omitted). However, the court rejected the defendant's arguments, and noted that while the general rule is that:

> [a]dvertisements of goods by display . . . are not ordinarily intended or understood as offers to sell," the ultimate inquiry is whether "based on 'the totality of the circumstances' surrounding the advertisement—'. . . the advertiser, in clear and positive terms, promised to render performance in exchange for something requested by the advertiser, and whether the recipient of the advertisement reasonably might have concluded that by acting in accordance with the request a contract would be formed.'

*Id.* at 1039 (citing *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 787–88 (9th Cir. 2012)). The court found that the defendant's advertisement stated "clear and positive terms" that promised the plaintiffs a free lift ticket in exchange for purchasing ten gallons of fuel, and the plaintiffs "accepted the offer through performance by purchasing ten gallons of fuel[.]" *Id.*

The advertisement before the Court here is almost identical in nature to the one that was at issue in *Kearny*—Burger King offered Plaintiffs a "0% beef" Impossible Whopper. (*See* Dkt. 19 at Exhibit 1.) Further, as in *Kearny*, Plaintiffs accepted Burger King's offer by making their purchase. (Complaint at ¶ 87.) However, as Plaintiffs alleged, they did not in fact receive a meat-free Impossible Whopper because they were "cooked in a manner that covers it in meat by-products." (*Id.* at ¶ 89.) Thus, despite Burger King's best efforts to make it seem as if it never promised Plaintiffs "a separate cooking surface" (MTD at 10), it cannot misdirect the Court from the crux of the issue that Burger King promised Plaintiffs that the food product ultimately provided to them would be meat-free. Viewing these allegations – as they must be – in the light most favorable to Plaintiffs, they state a simple, precise and viable claim for breach of contract.

###### C.     Burger King's Conduct Was Likely To Deceive A Reasonable Consumer.

Refusing to accept any responsibility for failing to hold itself up to its own advertisements, Burger King dismisses in wholesale fashion all seven Plaintiffs' experiences and labels them "unreasonable" consumers. However, not only is Burger King's argument entirely premature, but it is also contrary to the weight of the caselaw.

To begin with, Plaintiffs do not, in fact, concede that "each guest's claims must be governed by the laws of the state in which the purchase occurred." (MTD at 10.) However, for purposes of deciding Burger King's Motion to Dismiss, Plaintiffs agree that their claims – whether they are brought under their home-state's consumer fraud statutes or Florida's – are all based on a "reasonable consumer" test. (*Id.*) Critically, these courts *also* consistently find that consumer fraud claims against food manufacturers for false advertising present issues of fact that cannot be decided at the pleading stage. *See, e.g., Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) ("whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer"); *Atik v. Welch Foods, Inc.*, No. 15-cv-5405, 2016 WL 11480151, at *8 (E.D.N.Y. Aug. 5, 2016) ("Federal courts 'have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]'") (citing *Williams*, 552 F.3d at 938); *Bohlke v. Shearer's Foods, LLC*, No. 14-cv-80727, 2015 WL 249418, at *9 (S.D. Fla. Jan. 20, 2015) ("[w]hether [specific] conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine") (internal citations omitted); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-cv-3826, 2015 WL 5579872, at *20 (E.D.N.Y. Sept. 22, 2015) ("[a] federal trial judge, with a background and experience unlike that of most consumers, is hardly in a position to declare that reasonable consumers would not be misled") (internal citations omitted).

11

Even if the Court were to decide at this stage of the case to examine the merits of Plaintiffs' allegations, the same conclusion would still apply. As Burger King notes, "the reasonable consumer standard" requires a "show[ing] that members of the public are likely to be deceived." *Williams*, 552 F.3d at 938. Here, Burger King attempts once again to turn the focus on the manner in which it prepared its Impossible Whopper burgers, arguing that "[i]t made no statements . . . that would have led a reasonable consumer to believe that restaurants would cook the patty separately . . . from beef patties." (MTD at 12.) In so arguing Burger King purposefully avoids the heart of Plaintiffs' allegations that it made a specific statement promising that its "Impossible Whopper" would be "0% beef"—regardless of how it was prepared. That is, Burger King advertised that its Impossible Whopper would be prepared and cooked in a manner that the end product was "0% beef." (Complaint at ¶ 26; Dkt. 19 at Exhibit 1.) However, Burger King instead prepared its Impossible Whopper burgers in a way that introduced meat into the burger prior to consumption so that Plaintiffs and other consumers around the country were not getting the "0% beef" burger that they were advertised and, as they allege, promised. (*Id.* at ¶ 27.)

Nor, as previously discussed above, can Burger King claim that it did nothing more than promise a "Whopper sandwich with an Impossible Foods patty made from plants[.]" (MTD at 12.) Burger King's main advertising tagline and the language most prominently featured on its advertisements, in-store signage, and drive-through menu, was "100% Whopper 0% beef" —it was *not* any statements about the patty being made from plants or even a reference to "Impossible Foods." (Dkt. 19 at Exhibit 1.) This is exactly why Burger King's advertising is "likely to be deceiving" to the public—while Burger King makes a simple, bold statement to its customers that its Impossible Whopper is "0% beef," Burger King from its own arguments demonstrates that it was *actually* intending to promise nothing more than a Whopper with an

12

"Impossible Foods" patty made from plants. Indeed, taking Burger King's logic to its natural conclusion, its Impossible Whopper could come with a second regular beef patty and its advertisement would *still* be "accurate" because customers would still be getting an "Impossible Foods" patty made from plants.

Burger King's argument is necessarily untenable and the disconnect between what its advertisement explicitly stated, and what Burger King now argues was what it actually intended to provide consumers, is exactly why its conduct was deceptive. This is especially the case given the lack of any clarifying language in its advertisements or even an asterisk next to "0% beef" clarifying that Burger King was only referencing the patty being put inside the burger *before* it was grilled. *See Marty v. Anheuser-Busch Companies, LLC*, 43 F. Supp. 3d 1333, 1341–42 (S.D. Fla. 2014) (upholding claims under California, New York, and Florida consumer protection statutes and finding that the defendant's independent understanding of an advertising statement did not mean that a reasonable consumer would reach the same conclusion).

The explicit nature and specificity of the advertising statement made by Burger King is precisely why it would be "premature to hold that no reasonable consumer would be misled by [the Defendant's] representations." *Atik*, 2016 WL 11480151, at *10. Indeed, courts have found sufficient evidence of possible misrepresentation even where the plaintiffs' claims were based on far more removed and vague representations that those brought forth here. For example, in *Atik*, the plaintiffs, similar to Plaintiffs here, brought claims under New York and California consumer protection laws against a manufacturer of gummy fruit snacks. *Id.* at *1. In particular, the plaintiffs claimed that the defendant's use of the word "wholesome," as well as representations on the packaging of whole fruit, along with a decal stating "Made with REAL Fruit," "misle[d] potential purchasers into believing there is a significant amount of the fruit depicted on the

13

packaging in the Fruit Snack when, in fact, there is not, and to mislead consumers into believing [they] are as healthy as fruit when they, in fact, are not." *Atik*, 2016 WL 11480151, at *9. The court denied the defendant's motion to dismiss, finding that it would not be "unreasonable" for a consumer to see the defendant's depictions of real fruit and the label "Made with REAL Fruit" and conclude that the fruit snacks would be "healthy" and contain significant amounts of fruit. *Id.* at *9. Furthermore, the court also found that the defendant's use of the phrase "wholesome" could "lead a reasonable consumer to believe the Fruit Snacks are healthy and contain a significant amount of fruit." *Id.*

Even more directly on-point, in *Stoltz*, the court found that the plaintiffs stated valid claims against the defendant under, *inter alia*, California, Florida, Georgia, Michigan, and New York consumer protection laws for featuring labeling on its yogurt products that stated "Total 0%" when in fact they contained sugars and carbohydrates. 2015 WL 5579872, at *4. The court rejected the defendant's arguments that "0%" customarily refers to the fat content of dairy and found that it was not unreasonable as a matter of law for a consumer to believe that "0%" meant that it contained no sugars or other "unhealthy" ingredients. *Id.* at *4, *20.[2]

Here, Burger King's explicit statement that its Impossible Whopper was "0% beef" is almost verbatim identical to the advertising the court in *Stoltz* found deceptive. And just as in *Stoltz*, Plaintiffs' allegations that they were misled to believe that their Impossible Whopper burgers contained no meat when in fact they did contain meat, at a minimum create a genuine issue of fact that cannot be resolved on a motion to dismiss. Plaintiffs' allegations are also far

---

[2] Similarly, the court in *Albert v. Blue Diamond Growers*, 151 F. Supp. 3d 412 (S.D.N.Y. 2015) refused to grant the defendant's motion to dismiss claims brought under New York and California consumer fraud statutes for describing its almond milk product as "made from real almonds" and showing a "number of almonds on the . . . packaging," when in fact no more than 2% of its content was almonds. 151 F. Supp. 3d at 415, 418–19.

more specific than the general depictions of fruit at issue in *Atik*, or a vague representation that something is "made with real fruit." As the court in *Atik* pointed out, taking the facts alleged by Plaintiffs as true – that Burger King prepared its Impossible Whoppers in a way that introduced meat into the burger – it would be improper to conclude "that no reasonable consumer would be misled" by Burger King's representations that the Impossible Whopper burger they were receiving was "0% beef." *Atik*, 2016 WL 11480151, at *10.[3]

In *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359 (S.D. Fla. 2014), the defendant argued, similar to Burger King's arguments, that the plaintiffs were conflating its labeling of products as "natural" with "organic" in claiming that they were misled to think that they would not contain certain processed and genetically modified ingredients. 43 F. Supp. 3d at 1385. The defendant further argued, similar to the arguments Burger King makes here, that the plaintiffs should have simply bought "organic" products if they wished to avoid those ingredients. *Id.* However, the court denied the defendant's arguments and found that "the issue is whether the 'all natural' labeling on Defendants product would mislead a reasonable consumer into believing they were buying a product free of GMOs . . . not whether buying 'organic' is 'an easy way to avoid such foods.'" *Id.* at 1385–86. So too here the Court should reject Burger King's efforts to conflate Plaintiffs' allegations that they were misled by its representations that the Impossible Whopper was "0% beef" with their "personal dietary requirements." (MTD at 12.) Nor is this case about

---

[3] Burger King offhandedly and without any support suggests that Plaintiffs' allegations that their Impossible Whoppers were "covered in meat by-product by virtue of having been cooked on the same flame-broiler used for meat patties" are "pure and unquantified speculation." (MTD at 10.) However, this sort of factual dispute is exactly why it is premature to dismiss Plaintiffs' claims at this stage. Furthermore, it is worth noting that Burger King itself admits that the manner in which the Impossible Whopper is cooked "means that the meatless burger will likely come into contact with bits of meat and poultry as it cooks." (MTD at 6) (citing https://www.today.com/food/new-burger-king-impossible-whopper-isn-t-vegetarian-t160203).

whether Plaintiffs "should have performed simple diligence" or "asked" Burger King's employees whether its Impossible Whopper actually complied with the company's own advertising. (MTD at 12.) Plaintiffs' allegations are clear—they believed they were purchasing a "0% beef" Impossible Whopper, when in fact they received an Impossible Whopper with meat in it. This is more than sufficient to state a claim for deceptive consumer practices.[4]

Burger King's citations to *Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016) and *Becerra v. Dr. Pepper/Seven Up, Inc.*, 945 F.3d 1225 (9th Cir. 2019) do little to support its arguments. In *Ebner* the plaintiff alleged that a lip product was deceptive because not all of the lip product was made accessible due to the application mechanism built into the product. 838 F.3d at 965. In granting the defendant's motion to dismiss the plaintiff's consumer fraud claims, the court noted that it was undisputed that the defendant's "label discloses the correct weight of included lip product." *Id.* The court also noted that a reasonable consumer understands "the general mechanics of these dispenser tubes[.]" *Id.* Here, Burger King's label is *not* accurate because it does *not* disclose that its Impossible Whopper does in fact contain some meat. Further, a reasonable consumer would understand that the point of ordering a food product with Impossible meat is to receive a food product that is meat-free and is prepared in a manner that maintains it as a meat-free product—not to order a meat substitute just to have it covered in meat by-products.

Nor is the decision in *Becerra* on-point. In *Becerra* the plaintiff alleged that the defendant's use of the word "diet" in its drink product could mislead consumers to think that it

---

[4] In fact, the rulings in *Atik*, *Albert*, and *Garcia* would even support a finding that Burger King also misrepresented how its Impossible Whopper would be prepared. Given that Impossible meats is widely known as a meat-free substitute and that preparing an Impossible meat patty in a way that introduces meat and entirely defeats the very purpose of ordering a food product with Impossible meat, a reasonable consumer could conclude that Burger King would be preparing its Impossible Whoppers in a manner consistent with how Impossible meat is ordinarily used.

would "assist in weight loss or healthy weight management." *Becerra*, 945 F.3d at 1229. The Ninth Circuit affirmed the district court's dismissal of the plaintiff's claims finding that "diet soft drinks are common in the marketplace" and that "diet" is reasonably interpreted to mean that the drink has less calories than its "regular counterpart." *Id.* at 1230. Here, Burger King's statement that its Impossible Whoppers were meat-free is not subject to any other "common" interpretation in the marketplace that is at odds with Plaintiffs' understanding. As stated above, if anything, Plaintiffs' allegations make clear that the common interpretation in the marketplace is that Impossible meats are specifically known as a meat alternative and are purchased as a meat-substitute—not as a product that would be cooked in a way that defeated the very reason why it exists and is purchased.

In sum, there is at a minimum an issue of fact as to whether Burger King's plain disclosures, and the context within which they were made, could mislead a reasonable consumer such that "this is not one of the 'rare situation[s] in which granting a motion to dismiss is appropriate' on [Plaintiffs'] consumer deception claims[.]" *Atik*, 2016 WL 11480151, at *12 (citing *Williams*, 552 F.3d at 939).

### D. Burger King Was Unjustly Enriched Because Plaintiffs Did Not Receive What They Bargained For.

Burger King abruptly concludes that Plaintiffs' unjust enrichment claims must fail because "they received and consumed what they ordered: an Impossible Whopper with a patty made from plants." (MTD at 14.) Plaintiffs' allegations, however, are clear that they did *not* receive what Burge King offered and what they ordered—an Impossible Whopper that was meat-free. (Complaint at ¶¶ 40, 42–44, 49–50, 55–57, 60, 62, 64–66, 71, 74, 149–151.) This is why Burger King's citation to *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007) is wholly

17

inapposite. As the court in *Marty* explained, in *Prohias* the plaintiffs "purchased a cholesterol reducing drug, and . . . obtained cholesterol reduction as a result. Therefore . . . they obtained the benefit of the bargain." *Marty*, 43 F. Supp. 3d at 1350 (citing *Prohias*, 490 F. Supp. 2d at 1236). Here, however, as in *Marty*, "[P]laintiffs . . . have alleged that they paid a premium price for what they believed was" a 0% beef Impossible Whopper and that they "would not have purchased" if they had known that they were not, in fact, 0% beef. *Id,* at 1351. As such, Plaintiffs "did not receive the benefit of that bargain and have alleged a cause of action for unjust enrichment." *Id.*; *see also Bohlke*, 2015 WL 249418, at *12.[5]

### E.    Dismissal of Plaintiffs' Class Allegations Is Premature And Contrary To Defendant's Arguments On The Merits of Plaintiffs' Claims.

Burger King's argument for dismissing Plaintiffs' class allegations ironically runs completely contradictory to its arguments for dismissing Plaintiffs' individual claims. Further, Burger King's insistence on the need for discovery to assess Plaintiffs' claims is exactly why it would be entirely premature to at this stage to dismiss Plaintiffs' class allegations.

To begin with, it is worth briefly addressing Burger King's arguments that customers might decide to buy its Impossible Whopper for "any number of reasons[.]" (MTD at 15.) While Burger King once again attempts to shift the focus on whether Plaintiffs are "vegan" or "vegetarian," it essentially admits Plaintiffs' point when it cites to Impossible Foods' statement that "Impossible meat is plant-based, but it wasn't made for vegans. It's actually made for people who love meat." (*Id.*) That is, if any Burger King customer purchased its Impossible Whopper because they wanted to try it and not because of their dietary restrictions, they only did so

---

[5] Plaintiffs plead their unjust enrichment claims in the alternative to their breach of contract claims and concede that to the extent the Court permits them to pursue their breach of contract claims it may dismiss their unjust enrichment claims. *See generally Marty*, 43 F. Supp. 3d at 1350 (discussing unjust enrichment under New York and California law).

because they wanted to purchase a *meat-free* burger—otherwise they would have simply purchased a regular Whopper burger with meat. As argued above, the meat-free nature of the Impossible Whopper is the main selling point of the Impossible Whopper.

Further, while Burger King repeatedly argues that Plaintiffs' claims are based on their "unique circumstances" (MTD at 16), Burger King also seeks to dismiss their claims under the reasonable consumer test, which is an "objective one, requiring a showing that a reasonable consumer would have been misled by the defendant's conduct." *Atik*, 2016 WL 11480151, at *7; MTD at 11 ("[t]he test is intentionally *objective*"). As such, whether Burger King's advertising was deceptive *can* be decided on a class basis—either it is objectively deceptive to a reasonable consumer, or it is not.[6] To hold otherwise would "effectively prohibit class actions involving low priced consumer goods" because every purchaser may have a unique independent reason for making their purchase. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 970, 1035 (C.D. Cal. 2015) (certifying classes of consumers who alleged that "100% Natural" label on cooking oil was deceptive); *see also Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 382, 403 (S.D.N.Y. 2016) (certifying classes of consumers who alleged that advertising of products as "natural" was deceptive); *Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 286, 288 (C.D. Cal. 2011) (certifying a class of consumers alleging deceptive advertising of probiotic products as "promot[ing] digestive health" and ruling that whether the defendant's representation "would have deceived reasonable consumers, can be litigated on a classwide basis"). Indeed, the fact that this action was brought by seven separate Plaintiffs from six different states, but is currently subject to a single motion to dismiss with common unitary

---

[6] This is especially the case given that Burger King does not address each of Plaintiffs' claims on the merits individually, but altogether.

arguments raised as to all of the Plaintiffs, is proof in and of itself that class certification is not *per se* impermissible.

Most importantly, as numerous courts have found, dismissal of class allegations at the pleading stage "is an extreme remedy" that would require the Court to find that "it will be impossible to certify the classes alleged . . . regardless of the facts the plaintiff[] may be able to prove." *Desmond v. Citimortgage, Inc.*, No. 12-cv-23088, 2015 WL 845571, at *1 (S.D. Fla. Feb. 25, 2015) (internal citations omitted). Critically, where, as Burger King itself admits is the case here, the "dispute concerning class certification is factual in nature and 'discovery is needed to determine whether a class should be certified,' a motion to strike the class allegations at the pleading stage is premature." *Smith v. State Farm Mut. Auto. Ins. Co.*, No. 13-cv-2018, 2015 WL 13658072, at *2 (N.D. Ill. Jan. 13, 2015); *see also In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1351 (S.D. Fla. 2013) (denying motion to strike class allegations in suit alleging deceptive marketing practices as premature); *Garcia v. Clarins USA, Inc.*, No. 14-cv-21249, 2014 WL 11997812, at *4 (S.D. Fla. Sept. 5, 2014) (same). Dismissal at this stage is premature and inappropriate because, as already shown by Defendant's own arguments and citations to a myriad of outside sources and evidence, class certification will undoubtedly be a fact intensive inquiry that requires additional discovery.[7]

## IV.   CONCLUSION

Accordingly, for the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendant's motion to dismiss in its entirety.

---

[7] While Burger King argues that Plaintiffs failed to specify under which provision of Rule 23 they are seeking certification (MTD at 16), Plaintiffs' clearly bring this case under Rule 23(b)(3) as they allege that "common questions of law and fact . . . predominate over questions affecting . . . individual members of the Nationwide Class and Subclasses." (Complaint at ¶ 79.)

April 16, 2020

PHILLIP WILLIAMS, WILLIAM JONES,
MICHAEL ROBERTS, ALI BEY,
CHRISTOPHER MCGEE, TIFFANY
CUTHRELL, and MARIE VENTER, individually
and on behalf of classes of similarly situated
individuals

/s/ David P. Healy
One of Their Attorneys


David P. Healy
Fla. Bar ID # 940410
dhealy@davidhealylaw.com
Dudley, Sellers, Healy & Heath, PLLC
3522 Thomasville Rd., Suite 301
Tallahassee, Florida 32309
Tel: (850) 222-5400
Fax: (850) 222-7339

Eugene Y. Turin (*pro hac vice*)
eturin@mcgpc.com
McGuire Law, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Counsel for Plaintiffs and the putative Class*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing *Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint and Deny Class Certification* on April 16, 2020 using the CM/ECF filing system which will cause a true and correct copy to be sent to all attorneys and interested parties of record.

/s/ David P. Healy

22